```
                  UNITED STATES DISTRICT COURT
                      DISTRICT OF VERMONT

MAJESTIC CORPORATION OF        :
AMERICA, INC.,                 :
         Plaintiff             :
                               :
    v.                         :      CIVIL NO. 1:06CV35
                               :
JOSEPH CREPEAU,                :
         Defendant             :
_____:
```

RULING ON MOTION FOR PRELIMINARY INJUNCTION
(Paper 25)

I. Background

After an evidentiary hearing conducted on January 29, 2007, and upon review of the parties' testimony and submissions, the Court finds the following facts. See Fed. R. Civ. P. 65(a)(2) ("any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated").

Majestic Corporation of America, Inc. (hereinafter "Majestic") is a Vermont corporation involved in reposession work for clients throughout Vermont, New Hampshire, and Massachusetts. Majestic's main officers are Bob Lake, president, and Maura Fitzgerald, vice president.

Defendant Joseph Crepeau is a resident of Maine. He has known Bob Lake for years and performed repossession work for him as an independent contractor throughout the 1990s.

1

In 2002, Lake approached Crepeau with a proposal that he work for Majestic and open an office for the company in Eastern Massachusetts.  On March 26, 2002, Ms. Fitzgerald, on behalf of Majestic, offered Crepeau a job as its Director of Operations for a subsidiary of Majestic, a position which required him to run its new "Eastern Massachusetts" office.

In relevant part, Fitzgerald's letter provides: "Understandably, the offer is contingent upon your successful civil and criminal background check as well as signing a non-competition agreement."  Pl.'s Ex. 1.  The letter also indicates the parties discussed the issue of health insurance.  It states: "We offer individual health insurance, however, our insurance does not extend to Maine/New Hampshire.  Could you [Crepeau] provide us with you[r] current health insurance information so that we can research this further?"  Pl.'s Ex. 1.

Crepeau made known that he wanted Majestic to provide him access to an affordable group health insurance program covering him and his family.  In turn, Majestic informed Crepeau that it currently could not provide him such coverage, and it asked him to perform his own research on health insurance.  Crepeau, in fact, did provide details about a Harvard Pilgrim Health Care Plan.  <u>See</u> Def.'s Ex. A.  As a Vermont-based company, however, Majestic could not enroll Crepeau in any Massachusetts-based group insurance plan he selected.

According to Mr. Crepeau, access to group health insurance coverage was important because he, his wife, and one of his sons all suffered significant health problems which had required him to pay a substantial amount for uninsured medical expenses.  In addition, Crepeau had found that any insurance he could individually purchase was both prohibitively expensive and required large deductibles.

Mr. Crepeau actually began working for Majestic on or about June 1, 2002, but it was not until June 17, 2002 that he signed the required Non-Compete Agreement (hereinafter "the Agreement").  See Pl.'s Ex. 4.  The Agreement states that during Crepeau's employment and for a 36-month period following the termination of his employment "for any reason," he will not disclose any of Majestic's trade secrets or confidential information. See Non-Compete Agreement at para. 3.  In addition, the Agreement provides:

> 5. **RESTRICTIVE COVENANT**
> Employee agrees that:
>
>> a. For a period of thirty six (36) months after termination for any reason, regardless of whether the termination is initiated by Employer or Employee, or for a period of time equal to the length of Employee's employment with Employer if such tenure is less than twenty-four-months, Employee will not, directly or indirectly, solicit any person, company, firm, corporation or entity who is or was a customer of the Employer during a period of five (5) years prior to the termination of the Employees [sic] employment.  Employee agrees not to solicit such customers on behalf of

3

> himself or any other person, firm, company, corporation or organization of any type.
>
> b. The Employee agrees that for a period of six (6) months after the termination of his employment with Employer, he will not accept employment with, or act as a consultant, contractor, advisor, or in any other capacity for a competitor of the Employer, or enter into competition with the Employer, either by himself or through any entity owned or managed in whole or in part by the Employee, within a seventy-five (75) mile radius of Employer's office(s) in which the Employee worked. The term "competitor", as used in this Paragraph 5, means any entity primarily engaged in the business or providing repossession and transportation services, or primarily engaged in any other business which Employer engages in subsequent to the date of this Agreement.

The parties further agreed that any disputes under the Agreement are "subject to and governed by the laws of the State of Vermont." Agreement at para. 18.

Mr. Crepeau asserts that, by March 2004, he had a number of concerns with the way Majestic was requiring him to do business in Massachusetts. He maintains Majestic was unwilling to obtain Massachusetts towing license plates, which Majestic disputes was a requirement to properly operate in Massachusetts. He also testified to his continuing concern that Majestic still had failed to enroll him and his family in a group health insurance plan.

As a result of these issues, Crepeau left Majestic and took a sales job at Hampton Ford Hyundai, an area automobile dealership. Mr. Crepeau testified that the main attraction of

the sales job was that he would be eligible for Blue Cross/Blue Shield group health insurance benefits, with full family coverage, after 90 days.  His March 8, 2004 letter of resignation, however, gave no indication that health insurance was the reason for his leaving Majestic.  See Def.'s Ex. R.

One day after leaving Majestic, Crepeau, at Lake's request, attended a meeting of Majestic employees held at a New Hampshire hotel.  One topic of discussion at this meeting was the general desire of Majestic employees for an available health insurance program.  As in the past, Majestic expressed a general willingness to secure group coverage to employees operating outside Vermont, but neither Lake nor Fitzgerald made any promise that such coverage would become available.

After working at the Ford dealership for slightly more than two weeks, Crepeau returned to work at Majestic because he was generally dissatisfied with his job at the dealership.  See Def.'s Ex. D (indicating his employment at the dealership from March 22 to April 4).  Everyone who testified at the hearing, including Mr. Crepeau, acknowledged that he resumed his position with Majestic under the "same terms and conditions" as were previously in place.

Mr. Crepeau worked for Majestic for more than a year before he again decided to leave.  The parties dispute the reasons for Crepeau's second resignation.  At the hearing, Majestic suggested

Mr. Crepeau had failed to run his Massachusetts office efficiently, a claim Crepeau disputes.  Mr. Crepeau asserted continuing disagreements about company operations in Massachusetts, as well as unavailable group health insurance coverage.  See, e.g., Pl.'s Ex. 9 and Def.'s Ex. C and R (referring to a $400 fee dispute and proposed garnishment of wages).

In any event, the second time he resigned from Majestic, Mr. Crepeau never mentioned an outstanding issue concerning his health insurance.  In a note dated November 16, 2005, Crepeau wrote:

> Dear Bob,
>
> Please be advised that I have read your email dated 11/15 in which you ask m[e] how I plan to pay back the $400 "MISTAKE" when I read the release wrong and did not collect the repo and storage fees from a debtor.  You stated that I gave my resignation on 11/10 and that if I didn't feel that I should pay the $400.000 back then you would accept that as my resignation.
>
> First of all, when Brenda brought this up I asked her if she was kidding.  She informed me that she was not.  I in turn told her that I was already having financial difficulties due to medical bills and even said that I just cashed in my vacation pay for car repairs.  I told her that I couldn't believe that she was serious and I didn't know if you felt that way about me if I should leave my phone & pager.  I didn't say I was resigning.  She then stated that I should think about how I was going to pay that back over the weekend.
>
> After thinking about it over the weekend, I emailed my position on this matter.  And I have already mailed you my resignation on 11/15 and you should have

6

>    it by today or by Thursday 11/17.  I am now faxing you
>    a copy now.
>
>         I have offered to work out two weeks to help Beth
>    get up to speed on everything.  If you elect not to
>    have me work through the two weeks, please advise me
>    who to turn my cell phone, pager and have the [sic]
>    sign for and take possession of the petty cash.

Pl.'s Ex. 9.

Mr. Crepeau began to work for American Asset Recovery Services, Inc. (hereinafter "AARS") in late November 2006.  See Pl.'s Ex. 10.  It is undisputed AARS is a competitor of Majestic, it is in the same asset recovery business as Majestic, and that it operates from Ispwich, Massachusetts, which is within the 75-mile radius covered by the Non-Compete Agreement.

Like Majestic, AARS services customers in parts of Massachusetts and New Hampshire, as well as Maine.  As AARS's Director of Operations, Mr. Crepeau has similar responsibilities and duties to those he performed for Majestic.  Furthermore, several letters entered into evidence at the preliminary injunction hearing indicate that, after leaving Majestic, Mr. Crepeau solicited business in violation of the Agreement.  See Pl's Ex. 10 ("It was nice talking to you today in my capacity as Director of Operations for American Asset Recovery Specialists, LLC"); Pl.'s Ex. 11 ("This letter is written to acknowledge your recent solicitation efforts in regards to offering your companies [sic] services to Eastern Bank."); Pl's Ex. 12 ("As I stated during our phone conversation, we have online services for our

clients and that means that we are able [to] send updates, digital photographs, and condition reports via e-mail."); Pl.'s Ex. 16 ("I see you have moved and so have I.  This is Joe Crepeau and I am now with [AARS].").

## II. Standard for Injunctive Relief

In this Circuit, the requirements for injunctive relief are well-established:

> To obtain a preliminary injunction, plaintiff must show irreparable harm, absent injunction relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.

Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 113-14 (2d Cir. 2006).

The plaintiff has demonstrated irreparable harm.  For the purpose of obtaining injunctive relief, "irreparable harm" is injury where money damages provide inadequate compensation.  See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979).

The parties themselves essentially have agreed that, in the event of a violation of the Agreement, money damages are insufficient to compensate Majestic.  In relevant part, the Agreement provides:

> Consequently, Employee agrees that in the event he breaches or threatens to breach any of these covenants, Employer shall be entitled to both; 1.) preliminary or permanent injunction in order to prevent the

>    continuation of such harm; and 2.) money damages,
>    insofar as they can be determined, including, without
>    limitation, all reasonable cost[s] and attorneys fees
>    incurred by the Employer in enforcing the provisions of
>    this Agreement.  Nothing in this Agreement, however,
>    shall prohibit Employer from also pursuing any other
>    remedy.

Agreement at para. 6(a).  Accordingly, Mr. Crepeau's potential use of Majestic's confidential information, and his solicitation of Majestic's clients, constitutes irreparable harm for the purpose of enforcing the Agreement.  Cf., Vermont Elec. Supply Co., Inc. v. Andrus, 132 Vt. 195, 999 (1974) (After considering the nature of the employee's duties and his intimate knowledge, the court concluded "potential for harm to the plaintiff's business was certainly established . . .").

In addition, Majestic has demonstrated a likelihood of success on the merits.  "The modern approach to reviewing restrictive covenants is one of reasonableness.  Courts seek to balance the employer's interest in protecting its business and investments, the employee's interest in pursuing a desired occupation, and the public's interest in the free flow of commerce."  Summits 7, Inc. v. Kelly, 178 Vt. 396, 399 (2005).

To determine whether this Agreement is unduly restrictive, the Court must look to its restrictions as to time and place. Roy's Orthopedic, Inc. v. Lavigne, 142 Vt. 347, 350 (1982). Under the test set forth in the Restatement (Second) of Contracts, § 188, a noncompetition agreement may be found

9

unreasonable "(1) if the restraint is greater than needed to protect the promisee's legitimate interest, or (2) the promisee's need is outweighed by hardship to the promisor and likely injury to the public." Summits 7, Inc., 178 Vt. at 400.

The testimony indicates the Agreement properly resulted from bargaining between the parties at the beginning of the employment relationship and was supported by adequate consideration. See Summits 7, Inc., 178 Vt. at 404 ("A noncompetition agreement presented to an employee at any time during the employment relationship is ancillary to that relationship and thus requires no additional consideration other than continued employment."). The Agreement restricts Mr. Crepeau from working for a competitor within 75 miles of Majestic's Massachusetts office for a period of six months. It further restricts active solicitation of Majestic customers for a period of 36 months. Similar provisions have been found to be reasonable. See, e.g., A.N. Deringer, Inc. v. Strough, 103 F.3d 243, 248 (2d Cir. 1996) (suggesting 100 miles from office in which Mr. Strough worked was a reasonably proscribed area); Vermont Elec. Supply Co., Inc. v. Andrus, 132 Vt. at 198-99 (five-year restriction found reasonable); Abalene Pest Control Serv. Inc. v. Hall, 126 Vt. 1, 8-9 (1996) (company held entitled to order restraining former employee soliciting customers for five-year period).

To explain his violation of the Agreement, Mr. Crepeau essentially relies on Majestic's failure to provide group health insurance coverage. The testimony at trial, however, indicates that Majestic never promised to provide him health care coverage. When initially hired, Mr. Crepeau knew that Majestic's then-available health plans could not include employees based in other states. After he had done his own research on available plans, Crepeau was further informed that the Harvard Pilgrim Insurance Plan he found did not extend to Vermont. Moreover, Crepeau testified that, for a period of time, he accepted $250 per month in supplementary payments from Majestic, after the company informed him that it could not find a way to provide him group coverage. These facts suggest the Majestic's failure to provide group health insurance cannot excuse Mr. Crepeau's breach of the Agreement.

Vermont courts have expressed a willingness to enforce non-competition agreements "unless the agreement is found to be contrary to public policy, unnecessary for protection of the employer, or unnecessarily restrictive of the rights of the employee, with due regard being given to the subject matter of the contract and the circumstances and conditions under which it is to be performed." Systems & Software, Inc. v. Barnes, 178 Vt. 389, 391 (2005) (citations and quotations omitted). In this case, Majestic has demonstrated that Mr. Crepeau has violated the

non-solicitation provisions of their contract.  Within days of leaving Majestic, Mr. Crepeau began to solicit its customers.  Such actions potentially interfere with Majestic's customer relationships, an interest which the Vermont Supreme Court has indicated is broader than protection of proprietary and confidential information, and which is properly subject to protection by use of a non-competition agreement.  <u>Systems & Software</u>, 178 Vt. at 392 (quoting Restatement (Third) of Employment Law § 6.05 cmt. b).

In conclusion, Mr. Crepeau (1) is employed by Majestic's direct competitor in the same market in which he previously had worked, and (2) has solicited several of Majestic's current customers.  Under these circumstances, enforcement of the Non-Compete Agreement which Crepeau voluntarily executed is reasonable.

Accordingly, it is so ORDERED:

1. That Majestic's Motion for a Preliminary Injunction is GRANTED.

2. Effective as of the date of this Order, as set forth in the parties' Non-Compete Agreement, defendant Joseph Crepeau shall cease working for AARS for a period of six (6) months, and he is prohibited thereafter from indirectly or directly soliciting any business from entities which were customers of

Majestic during Mr. Crepeau's employ at Majestic, for a period of thirty-six (36) months.

    3. The Court will not require security from the plaintiff at this time.

    SO ORDERED.

    Dated at Brattleboro, Vermont, this 23rd day of March, 2007.

    <u>/s/ J. Garvan Murtha</u>
    J. Garvan Murtha
    United States District Judge